# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

№ 18-CV-2200 (RER)

---

BRIAN MATZKOW,

Plaintiff,

VERSUS

UNITED NEW YORK SANDY HOOK PILOTS ASSOCIATION,

Defendant.

---

**MEMORANDUM & ORDER**

January 7, 2022

---

**RAMON E. REYES, JR., U.S.M.J.:**

Plaintiff Brian Matzkow ("Plaintiff" or "Matzkow") brings this action against United New York Sandy Hook Pilots Association ("Defendant" or "SHP"), alleging violations of the Jones Act, 46 U.S.C. §30104 ("Jones Act"), and the general maritime law of the United States. (ECF No. 1 ("Compl.") ¶ 1).  The parties have consented to my jurisdiction pursuant to 28 U.S.C. § 636(c)(1). Currently before the Court is SHP's motion to exclude expert testimony pursuant to Rule 702 of the Federal Rules of Evidence and for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 51 ("Def.'s Mot.")).

For the reasons discussed below, SHP's motion is DENIED.

1

## BACKGROUND

I.    Factual History

Matzkow alleges that he was injured while working as a crew member aboard the pilot boat New Jersey. (Compl. ¶18; ECF No. 9 ("Ans.") ¶18; ECF No. 51-2 ("Def.'s Mem." [1]) at 1)). At the time of his injury, he was transferring food and sundry items ("stores") from the launch boat Yankee to the New Jersey. (Def.'s Mem. at 1; Compl. ¶ 1; ECF No. 25-2 at 1–2). Matzkow attributes the accident, and thus his injuries, to both or either of the vessels' unseaworthiness and SHP's negligence. (Compl. ¶ 19).

SHP owned and operated both vessels. (Ans. ¶¶ 11-14). SHP is engaged in the business of providing licensed pilots to commercial maritime vessels. (ECF No. 52-2 ("D. Masse Dep.") 9:6–10:8).[2] To engage in this business, SHP keeps at least one station boat (e.g., the New Jersey) at sea twenty-four hours per day and uses smaller launch boats (e.g., the Yankee) to ferry the licensed pilots to the incoming ships. (D. Masse Dep. 9:13–19). Because the station boats remain in the harbor area for long periods of time, the crews conduct a weekly transfer of personnel and stores between the vessels. (ECF No. 52 ("Pl.'s Opp'n") at 5; Def.'s Mem. at 1).

---

[1] Although the document is labeled "Plaintiff's Memorandum," the Court presumes it is intended to serve as Defendant's memorandum because it was submitted by Defendant's counsel.

[2] Dan Masse ("D. Masse") has been employed by SHP as a cook for twenty-five years; Matzkow was his "boss." (D. Masse 6:5–13, 7:3).

A.  The Vessels

The New Jersey and Yankee are both registered with the U.S. Coast Guard. (ECF Nos. 51-10 and 11). The New Jersey is 495 gross tons and 127.5 feet long with a steel hull. (ECF No. 51-10). The Yankee is 59 gross tons and 55.8 feet long with an aluminum hull. (ECF No. 51-11).

Both vessels are "uninspected" as defined by 46 C.F.R. Subchapter C. (Def.'s Mem. at 9). The vessels are not cargo vessels or engaged in foreign trade. (ECF No. 53-1 ¶ 20). Further, SHP did not voluntarily adopt the requirements of the International Safety Management ("ISM") Code. (ECF No. 53-1 ¶ 21). Thus, neither the Safety of Life at Sea Convention 1974 ("SOLAS") nor the ISM is binding on SHP or its employees.

The parties agree that the vessel decks were level at the starboard aft portion of the New Jersey and the port side aft portion of the Yankee where the transfer occurred. (ECF No. 53-1 ¶ 5). However, they disagree about whether there was a three-foot gunwale rail over which stores had to be lifted to move them from the Yankee to the New Jersey. (ECF No. 51-9 ("Feminella Dep.") 63:15–25 ("There is no gunwale on the railing of the pilot boat 'Yankee.' So, the people on the stern of both transferring stores are standing eye to eye with the gunwale in the rail, the safety rail basically on the aft portion of the 'New Jersey.'") [3]; Pl.'s Opp'n at 7; ECF No. 52-4 ("G. Masse Dep.") 31) ("That day it was probably three feet. . . . [T]hey would have had to lift.").[4]

---

[3] Captain Steven Feminella ("Feminella") has been an independent contractor for SHP since 2017 and completed a five-year apprenticeship with SHP before that. (Feminella Dep. 9:220–25). He was "responsible for overseeing the transfer of stores" on September 30, 2015. (Def.'s Mem. at 7).

[4] Gregory Masse ("G. Masse") has been employed by SHP as a day-man for approximately twenty-seven years and was part of Matzkow's crew. (G. Masse Dep. 5:8–16, 6:20–22).

B. Protocols & Training for Stores Transfer

On a weekly basis the crew of the New Jersey transferred stores from vessel to vessel while underway, meaning that the vessels were not tied to dock or anchored.[5] (ECF No. 53-1 ¶ 3; ECF No. 51-4 ("Matzkow Dep.") 38:7–12; Feminella Dep. 71:9–17, 113:23–25, 116). "It was everyone's responsibility to take part in transferring the stores," (Matzkow Dep. 37:12–14), as part of an assembly line of sorts. (D. Masse Dep. 21:7–8; G. Masse Dep. 12). Captain Steven Feminella ("Feminella") described the transfer of stores as so routine that the crew conducting the transfer was capable of completing it without oversight. (Feminella Dep. 71:9–17). Skill is needed though, as there is "a timing element involved . . . between the movement of the boats." (G. Masse. Dep. 31:23–32:3).

The parties dispute whether Matzkow was trained in this process. Feminella is not aware of any written safety protocols for SHP's crew. (ECF No. 53-1 ¶ 27). SHP also does not require its crews to conduct safety drills with regard to the vessel-to-vessel transfer of stores. (ECF No. 53-1 ¶ 27; Feminella Dep. 31:24–32:4; 33:15-19; Pl.'s Opp'n at 6). Instead, according to Feminella, the crew was trained in vessel-to-vessel transfer of stores through on-the-job experience. (ECF No. 53-1 ¶ 3; Feminella Dep. 36:13–23). Matzkow counters that while the record reflects that able-bodied ("AB") deckhands were trained in stores transfer, (*see* Feminella Dep. at 106:12-21), he, as a steward and cook, was not. (ECF No. 53-1 ¶ 3).

It is undisputed that the New Jersey did not have any equipment that could have been used for the safe transfer of stores from vessel to vessel. (ECF No. 53-1 ¶ 28). Feminella stated that no

---

[5] D. Masse stated that during vessel-to-vessel transfer, the vessels would be "stopped dead in the water." (D. Masse Dep. 23:5–10). Similarly, Matzkow stated that transfer was mostly done while the boats were stationary, but "if there's a little wind or swell coming from one direction," the vessels would be slightly "under power." (Matzkow Dep. 39:20–25).

equipment was used for regular transfers of stores. (Feminella Dep. 112). The parties dispute whether there is a maximum weight that crew members should carry for vessel-to-vessel transfers of stores. (ECF No. 53-1 ¶ 29). They also dispute whether crew members, other than Feminella, were trained to, or in fact did, break down the stores into smaller and lighter loads during the transfer. (ECF No. 53-1 ¶ 30). G. Masse clarified that, in general, the stores were in sacks or boxes. (G. Masse Dep. 21:21–22). Feminella stated that he was trained to break down stores to make them more easily transferable (Feminella Dep. 102:7–103:9; 98:12–16; ECF No. 53-1 ¶ 30) and that stores were typically broken down into individual units before transfer. (*Id*.. 102:3–5). Feminella also stated that, while there is not a written protocol, on-the-job training teaches deck hands to always hold a rail for safety. (*Id*. 36:6-37:8).

The parties disagree about whether using a line to keep the vessels alongside would have been safer. Feminella described at length why using a spring line in certain conditions is not safe. (*Id*. 72:2–6, 110–111).

Sea and weather conditions affect the safety of stores transfer. SHP denies that vessels would be brought into the harbor for transfer of stores if there were rough seas.[6] (ECF No. 53-1 ¶ 31). Instead, G. Masse recalls approximately four times that the conditions were so bad that the crew did not conduct the weekly transfer. (G. Mass. Dep. 27:8–1). He described seven- or eight-foot swells on those occasions. (*Id*. 29:2). Burns confirmed that if the conditions were unsafe, that the crew would delay transfer until it was safer. (Burns Aff. ¶ 8).

---

[6] SHP denies that any prior union contract included a provision that addressed the transfer of stores. (ECF No. 53-1 ¶ 31; Burns Aff. ¶ 5).

5

### C.   Conditions at the Time of Transfer on September 30, 2015

On the day in question, there were no reported issues with either of the vessels, (Feminella Dep. 93:13-18; ECF No. 52-5 ("Gove Dep.") 50:6–10), and no complaints beyond the "normal" complaints crewmembers regularly made (G. Masse Dep. 41:2; Gove Dep. 43:5–11).

There is conflicting evidence regarding whether it was safe to transfer stores vessel-to-vessel in the weather and sea conditions on September 30, 2015. Matzkow alleges that "[t]he water conditions on September 30, 2015 were too rough to allow for the safe transfer of stores; there was a confused sea state due to the meeting of two weather systems and the remnants of a hurricane weather pattern." (Pl.'s Opp'n at 7; Matzkow Dep. 52:11–20). According to SHP, the conditions in which the transfer occurred were typical. (ECF No. 53-1 ¶ 32).

At the time of the transfer, the vessels were not in the harbor. (Matzkow Dep. 40:12–15; 41:8–9; G. Masse Dep. 10). The New Jersey was "approximately on a western heading proceeding at approximately six knots." (ECF No. 53-1 ¶ 7; Feminella Dep. 67:15–21). The Yankee was underway to keep alongside the New Jersey. (G. Masse Dep. 15:25–16:3; Gove. Dep. 24:23–25). Feminella described the environment as "variable" because the pilots continually adjusted their speed in order to keep the vessels alongside one another. (Feminella Dep. 67:4–21).

There was a southerly wind around twenty knots and a two-to-four-foot southeasterly swell. (ECF No. 53-1 ¶ 6). SHP asserts that the sea conditions were not rough and that there were no adverse weather conditions that would cause rough seas. (*Id*. ¶ 33). Feminella stated that there was a light drizzle but otherwise described the conditions as "[a]verage." (Feminella Dep. 60:20-23; 61:5, 16–20, 82:19–20, 114:2–8). Similarly, Gove described the transfer as typical, (Gove Dep.

28), and Raucci stated that it was a "normal" day (ECF No. 52-3 ("Raucci Dep.") 22:11–13) [7]. On the other hand, G. Masse described the weather as "a little rough that day." (G. Masse Dep. 25:2–22). He recalls that it was overcast but not raining. (G. Masse. Dep. 26:17–19).

Matzkow recalled that the pilots were having trouble keeping the ships together, (Matzkow Dep. 49:20–50:25), and that the transfer of stores had to start and stop a number of times. (*Id.* at 49:8-10). According to Matzkow, the sea and weather conditions caused the vessels to spread apart very quickly, which was not typical. (*Id.* at 49:23–50:2). As a result, there were some bounces or collisions between the boats. (*Id.* at 56:13–14; G. Masse Dep. 26:4–7). More specifically, Gove stated that there were two bounces or hits between the vessels just before Matzkow's injury and that similar bounces did not occur during every transfer of stores. (ECF No. 53-1 ¶ 34). According to Gove, the bounces were "unexpected."[8] (Gove Dep. 41:4–8). Matzkow testified that he complained to Raucci about the bounces. (Matzkow Dep. 57:15–25). G. Masse does not recall the vessels colliding. (G. Masse Dep. 39:13–14).

Matzkow alleges that when the transfer started, there was a line connecting the vessels, but that it was later removed. (Matzkow Dep. 57; *see also* G. Masse Dep. 16–17).

### D.  The Transfer of Stores on September 30, 2015

On or about September 30, 2015, Matzkow was employed by SHP as a seaman and member of the crew of the New Jersey. (ECF No. 53-1 ¶ 1). At approximately 9:00 A.M., Matzkow and

---

[7] Michael Raucci ("Raucci") has been an SHP steward for over five years and was part of Matzkow's crew. (Raucci Dep. 5:20–6:4).

[8] Gove could not see Matzkow at the time of the alleged injury. (ECF No. 53-1 ¶ 35).

other members of the crew were transferring stores from the Yankee to the New Jersey. (*Id.* ¶ 2). Specifically, Matzkow was on the Yankee passing "foodstuffs" to a crewman on the New Jersey. (Def.'s Mem. at 2; G. Masse. Dep. 29–31).

"[T]he transfer of stores was conducted at the aft portion of the vessels, the port side of the Yankees and the starboard side of the New Jersey." (ECF No. 53-1 ¶ 5). Matzkow was port aft on the Yankee. (Matzkow Dep. 41:20, 42:7–15; 44:17; G. Masse Dep. 19:6–7). He was standing near Raucci and G. Masse. (Matzkow Dep. 44:22–23; Raucci Dep. 9:21–23; G. Masse Dep. 8:9–10).[9]

Feminella was responsible for overseeing this transfer and was observing from the conning station on the starboard side bridge wing of the New Jersey. (Def.'s Mem. at 2; Feminella Dep. 56:8–23; 70:9–14). He had visual and radio contact with Michael Gove ("Gove"),[10] (ECF No. 53-1 ¶ 4), who was driving the Yankee (Gove Dep. 16:4). Feminella and Gove discussed the weather conditions. (ECF No. 53-1 ¶ 4).

The crew had been transferring stores for about ten to twenty minutes, (Matzkow Dep. 48:23–24 (20–30 minutes); Feminella Dep. 57:12–21 (10–15 minutes); G. Masse Dep. 38:20–23 (ten minutes)), when, Matzkow alleges, while he was passing a box,[11] the New Jersey and the Yankee spread apart and then came back together, causing him to injure his outstretched arm. (Pl.'s Opp'n at 8). G. Masse recalls that Matzkow was holding onto a rail on the Yankee and did not use two

---

[9] Matzkow also testified that he was standing near D. Masse, (Matzkow Dep. 44:22–23), who testified that he was not present on the day in question, (D. Masse Dep. 25:10–20).

[10] Gove has been employed by SHP as a motorboat operator for eighteen years. (Gove Dep. 5:9–18).

[11] Deposition testimony establishes that the box weighed between fifteen and seventy pounds. (Matzkow Dep. 54:3–4 (55–60 pounds); G. Masse Dep. 33 (15–16 pounds); ECF No. 52-7 (70 pounds)).

hands to lift the box. (G. Masse Dep. 29:17–20). Instead, "he tried humping it up with one arm." (*Id.*). Matzkow claims that he did not fall because he had his foot wedged to stabilize himself.[12] (Matzkow Dep. 55).

Raucci and G. Masse then observed Matzkow grab his arm and go inside to put it in a sling and/or put ice on it; he was yelling. (Raucci Dep. 20; G. Masse Dep. 34:12–14). Gove observed Matzkow take a short video of the vessels after the incident. (Gove Dep. 35). The outgoing crew rode on the Yankee back to the dock; during that ride G. Masse observed that Matzkow was in pain. (G. Masse Dep. 35:2).

Feminella could see the transfer occurring but did not see anything that made him think that Matzkow had been injured. (Feminella Dep. 87, 91:10-12). He could not hear anything from below because of ambient noise in wheelhouse and radio chatter. (*Id*. 91:13-20). Feminella did not notice any improper action during the transfer. (ECF No. 53-1 ¶ 10). He made an entry in the logbook regarding Matzkow's injury as required. (Feminella Dep. 58:16–59:17, 92: 2–8).

E.   The Injury & Treatment

Matzkow alleges that his injuries resulted from contact between the New Jersey and the Yankee while transferring stores between the vessels. (ECF No. 53-1 ¶ 8). Matzkow was examined by SHP's physician who determined that "[b]ased upon the records reviewed and the history submitted, the most likely cause of the distal biceps tendon rupture was the alleged injury at work on 9/30/2015." (*Id*. ¶ 41; Gilbert Report at 4).

---

[12] No one on the New Jersey fell when the boats came back together. (ECF No. 53-1 ¶ 9).

After the injury, Matzkow was placed on medical leave. (ECF No. 53-1 ¶ 12). He was diagnosed with a "nontraumatic" rupture of his right biceps tendon.[14] (*Id*. ¶ 11). On October 6, 2015, Matzkow underwent surgery; he remained on medical leave until May 16, 2016 when he was declared "fit for duty." (*Id*. ¶¶ 11–12). On May 2, 2016, his surgeon noted that Matzkow was "currently [twenty-five] percent temporarily disabled right elbow and arm." (*Id*. ¶ 13).

Matzkow "has not seen any doctor or sought any treatment for his injury or surgery since May 2016." (*Id*. ¶ 15). SHP contends that Matzkow was never diagnosed with any permanent injury. (*Id*. ¶ 14). Matzkow denies that he was never diagnosed with a permanent injury and asserts that he has never fully recovered or regained strength in the affected arm. (*Id.*). He does strength-building exercises for his arm at home and expects that he will have to do so for the rest of his life. (*Id*. ¶ 15). However, he has not submitted any supporting invoices or medical records for physician appointments or treatment after May 2016. (*Id*. ¶ 17).

### F.  Captain Martucci

Plaintiff submits the expert testimony of Captain Richard P. Martucci ("Martucci") to support his claim that SHP's negligence caused Matzkow's injuries and that SHP's vessels were unseaworthy at the time Matzkow was injured. (Pl.'s Opp'n at 9). Defendant argues that Plaintiff's expert testimony fails the reliability and relevancy criteria required by Rule 702 of the Federal Rules of Evidence and therefore must be precluded. (Def.'s Mem. at 6).

---

[14] Despite the surgeon's notes, Matzkow "denies that the injury was non-traumatic in origin." (ECF No. 53-1 ¶ 11).

Martucci is a retired U.S. Navy Captain and former instructor at SUNY Maritime College. (Pl.'s Opp'n at 9). For more than thirty-five years, he worked on all types of maritime vessels. (*Id*.).

Martucci was "provided with all the available evidence from this matter, including Rule 26 disclosures, photographs, and deposition transcripts, and he reviewed same prior to making his report." (Pl.'s Opp'n at 9). At the time, Martucci did not have the vessel registration information because SHP had not yet provided that discovery. (ECF No. 53-1 ¶ 22). His expert report does not expressly reference or identify by name or citation any rules, regulations, or applicable statutes. (*Id*. ¶ 18). The parties dispute the extent to which he relies on the SOLAS and ISM Code for forming his opinions. (*Id*. ¶ 19).

## II.     Procedural History

Matzkow filed his Complaint on April 13, 2018. (Compl.). On July 7, 2020, I issued an order certifying that discovery was complete but for certificates relied on by SHP's expert. (Order dated 7/7/2020; Hearing Recording at 1:05–13).

The parties consented to my jurisdiction over this civil action, and the matter was thus referred to me on November 29, 2018. (ECF No. 21). SHP's motion for summary judgment is currently pending. (ECF Nos. 51–53).

## **DISCUSSION**

## I.     Admissibility of Expert Testimony

SHP has moved to disqualify Martucci, Matzkow's expert witness, and strike his testimony. (Def.'s Mot. at 1). For the reasons set forth below, the motion to strike is denied.

11

A. <u>Legal Standard</u>

When evaluating a motion for summary judgment, a court may only consider admissible evidence. *Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 666 (E.D.N.Y. 2013) (citing *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir.1998)). "[T]he trial judge has broad discretion in the matter of the admission or exclusion of expert evidence." *Arista Recs. LLC v. Lime Grp. LLC,* No. 06-CV-5936 (KMW), 2011 WL 1674796, at *1 (S.D.N.Y. May 2, 2011) (citing *Boucher v. United Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

Courts look to the totality of a witness's qualifications to assess whether the individual is qualified as an expert "by knowledge, skill, experience, training, or education." *Hollman*, 928 F. Supp. 2d at 667 (citing Fed. R. Evid. 702). Rule 702 of the Federal Rules of Evidence permits testimony by an expert when it is relevant and reliable, meaning that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court has identified additional factors ("the *Daubert* factors") for evaluating the reliability of expert testimony: (1) whether the theory or technique can (and has been) tested; (2) whether the theory or technique has been subjected to peer review or published; (3) the known or potential error rate, in the case of a scientific technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or technique enjoys general acceptance. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–94. The district court's inquiry is "flexible" and "the *Daubert* factors are neither exclusive nor dispositive." *United*

*States v. Raniere*, No. 18-CR-204-1 (NGG) (VMS), 2019 WL 2212639, at *5 (E.D.N.Y. May 21, 2019).

"The burden is on the party proffering the expert to demonstrate that the expert testimony is admissible by a preponderance of the evidence." *Id*., (citing *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)). A party may challenge the relevancy and reliability of the testimony of the opposing party's expert witness testimony; however, it is "the exception rather than the rule" to preclude the admission of expert testimony. *Clarke v. LR Sys.*, 219 F. Supp. 2d 323, 332 (E.D.N.Y. 2002). In the Second Circuit, "the standard for admissibility of expert testimony is especially broad." *United States v. Herron*, No. 10-CR-615 (NGG), 2014 WL 1871909, at *6 (E.D.N.Y. May 8, 2014); *Sullivan v. Ford Motor Co.*, No. 97-CV-0593 (RCC), 2000 WL 343777, at *5 (S.D.N.Y. Mar. 31, 2000) (citing *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989)) ("One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion.").

### B.  Captain Martucci's Testimony is Admissible

Matzkow has designated Martucci to offer an expert opinion regarding SHP's negligence and the unseaworthiness of the vessels. (ECF No. 51-5 ("Martucci Report")). Martucci provided an expert report and was deposed by SHP's counsel. (*Id*.; ECF 51-6 ("Martucci Dep.")).

Martucci offers two principal opinions in his report. First, he concluded that SHP was negligent "in transferring stores under the conditions present, and in the manner the activity was undertaken." (Martucci Report at 4). He notes that "the weather and sea conditions were not considered and discussed by all those involved before starting operations," and that "[m]edical attention was not provided by the Captain or Company." (*Id*. at 6). Second, he concluded that

13

"[t]he vessel was not provided with proper equipment for the transfer of stores," and thus was unseaworthy. (*Id.* at 4).

SHP argues that Martucci's testimony is neither reliable nor relevant in that it relied on rules, regulations, and standards that either were not binding on the New Jersey or Yankee or do not exist, and because he was not informed by all of the relevant facts. (*See* ECF No. 53 ("Def.'s Reply") at 3–5)[15]. Specifically, SHP argues that (1) Martucci does not expressly reference any applicable rules, regulations, and standards, and that no such rules, regulations, or standards exist; (2) he affirmed reliance on standards SHP deem non-applicable, namely, SOLAS Convention, ISM Code, OSHA, and U.S. Coast Guard Recreational Boating Guides, among others; (3) he views those sources as imposing obligations on vessels during store transfer operations; (4) the ISM does not create or alter duties that exist in general maritime law; (5) he did not submit the private materials on which he relied to inform his description of general practices; (6) he did not have information about the vessels or weather and did not amend his report once he obtained that information; and (7) the alternatives he suggests pose additional safety risks. (*Id.* at 1).

For the reasons discussed below, Martucci's testimony, limited as described herein, is admissible.

### 1. Martucci is Qualified

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the

---

[15] Although the document is labeled "Plaintiff's Reply Memorandum," the Court presumes it is intended to serve as Defendant's reply because it was submitted by Defendant's counsel.

proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). "[T]he expertise and area of proffered opinions should be closely related." *In re M/V MSC FLAMINIA*, No. 12-CV-8892 (KBF)**,** 2017 WL 3208598, at *4 (S.D.N.Y. July 28, 2017). "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007).

Martucci is a retired U.S. Navy Captain and former instructor at SUNY Maritime College who has worked on all types of maritime vessels for over thirty-five years. (Pl.'s Opp'n at 9). He has "[e]xtensive experience on container and ro-ro ships, also Passenger ships & tug/barge combo." (Martucci Report at 8). From 1989 through 2002, he served in the Military Sealift Command, including ten years as Captain of the USNS Bellatrix. (*Id.*). The Bellatrix weighed 48,000 tons and was 946 feet long. (Martucci Dep. 27:9–12). He has a Bachelor of Science in meteorology and oceanography and has taken additional courses, including the Master Mariners Readiness Course at the U.S. Merchant Marine Academy and various courses at the Military Sealift Command School. (Martucci Report at 9). Martucci has a marine license and is a master of steam or motor vessels of "any ocean any tonnage." (*Id.*). He has completed several U.S. Coast Guard training courses including Level III Medical training and Advanced Fire Fighter. (*Id.*).

Martucci provided a list of legal actions in which he was involved. (*Id.* at 11). He was retained as an expert in four matters. (Martucci Dep. 38–41 (Kalm, Dzienik, Yaffa, Felowski)). He submitted reports or was deposed in each of those matters but has not been required to testify at a trial. (*Id.* 40–41).

15

SHP states that because Martucci served as Captain on a merchant vessel and not a naval vessel he does not have relevant experience "to opine on industry regulations and standards that cannot be identified." (Def.'s Reply at 5). It also argues that he has never testified as an expert.[16] (*Id*. at 3).

Under the liberal standard of Rule 702, Capt. Martucci has sufficient experience regarding general maritime custom and practice. Moreover, disputes about Martucci's qualifications "go to the weight, not the admissibility, of his testimony." *McCullock v. H.B. Fuller Co.*, 61 F.3 1038, 1044 (2d Cir. 1995); *Almonte v. Averna Vision & Robotics, Inc*., 128 F. Supp. 3d 729, 741 (W.D.N.Y. 2015) ("Defendant's challenges to [expert's] academic training and his other alleged shortcomings, concern the weight and credibility of his testimony (not admissibility) and may be explored at trial on cross-examination.")

## 2.   Captain Martucci's Testimony is Reliable

The court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). "[F]aults in an expert's decision to use a particular methodology, or the lack of textual authority for an expert's opinion 'go to the weight, not the admissibility, of his testimony.'" *Clarke*, 219 F. Supp. 2d at 333 (quoting *McCullock*, 61 F.3d at 1044); *see also Hollman*, 928 F. Supp. 2d at 670. An expert witness should not be permitted to define the

---

[16] It is unclear whether SHP is arguing that a lack of experience testifying in court is somehow disqualifying for an expert, but regardless, such experience is not part of the analysis of qualifications required by Rule 702.

applicable legal requirements. *Douglas v. Chem Carriers Towing, LLC*, 431 F. Supp. 3d 830, 836 (E.D. La. 2019). "Expert testimony as to causation may be excluded, particularly where it is speculative and conjectural." *In re Air Disaster at Lockerbie Scot.*, 37 F.3d 804, 824 (2d Cir. 1994).

Martucci relied on several sources to inform his expert report: Matzkow's Complaint; undated photographs of sea conditions, the vessels, and Matzkow's right arm; Defendant's disclosures; the depositions of Matzkow, D. Masse, G. Mass, Raucci, and Gove; as well as his extensive experience. (Martucci Dep. 29:10–12, 29:23–30:4, 31:7–9, 44, 62:24–25, 83, 133; Martucci Report at 4). He also considered "the applicable rules, regulations, standards and good and accepted admiralty and maritime practice." (Martucci Report at 4). He has taken courses in the ISM. (Martucci Dep. 41:23–43:4).

He explains that "the maritime industry is not loaded with regulations." (Martucci Dep. 94:16–17). Instead, he described the regular practice of keeping vessels alongside one another using a spring line, (*Id*. 95–96), as well as making log entries of the sea and weather conditions. (*Id*. at 71, 74, 75:5–8). He also noted that it is common practice not to lift or carry anything too heavy while onboard a boat. (*Id*. 61:20–22, 86). Martucci explained that all incidents must be reported to the proper maritime authority, the Coast Guard. (*Id*. 79).

SHP argues that Capt. Martucci's testimony is unreliable because the ISM does not create any specific duties that SHP owed to Plaintiff. (Def.'s Reply at 6). To that end, SHP relies on cases that involve duty violations amounting to negligence *per se* or otherwise argue that the ISM created a specific duty. *See Johnson v. Horizon Lines, LLC*, 520 F. Supp. 2d 524, 533 (S.D.N.Y. 2007) ("While these state cases suggest that the standards of conduct described in § 96.230 may support a finding by a jury or trial court that a shipowner was negligent, they furnish no authority for

holding of negligence per se or the preclusion of comparative fault."); *Calderon v. Offen*, No. 07-CV-61022- (JICO), 2009 WL 3429771, at *5 (S.D. Fla. Oct. 20, 2009) ("Plaintiff was operating in cargo operations that were not under active control of the vessel but rather under control of his employer"); *Horton v. Maersk Line, Ltd.*, 603 F. App'x 791, 796 (11th Cir. 2015); *Jones v. Sanko Steamship Co., Ltd.*, 148 F. Supp. 3d 374, 392 (D.N.J. 2015) (rejecting plaintiff's attempt to enhance otherwise applicable duty). SHP also suggests that cases regarding "other industries" are instructive. Each of those cases cited by SHP involve an expert who relied on OSHA safety standards in an attempt to hold a manufacturer liable for a product liability claim. *See Almonte*, 128 F. Supp. 3d at 743; *Byrne v. Liquid Asphalt Sys., Inc.*, 238 F. Supp. 2d 491 (E.D.N.Y. 2002).

The ISM does not impose additional duties in this case, (ECF No. 53-1 ¶¶ 20–21), but it can help the court or a jury to understand an existing duty under the law; the Court may consider non-mandatory authorities "for the purpose of determining negligence." *Soliman v. Maersk Line Ltd.*, 235 F. Supp. 3d 410, 420 (E.D.N.Y. 2017) (citing *Jones v. Spentonbush–Red Star Co.*, 155 F.3d 587, 595 (2d Cir. 1998) (finding non-mandatory authorities "evidence of the standard of care, the violation of which may be accepted or rejected as proof of negligence by the trier of fact according to the sum total of all the evidence.")).

Thus, Martucci cannot be permitted to testify that that ISM was binding on SHP or created a duty, but he could testify that "a reasonable vessel operator would consider them in determining how to safely operate [a] vessel, and that other vessel owners and operators have taken the ISM . . . into account." *See Holzhauer v. Golden Gate Bridge, Highway, & Transp. Dist.*, No. 13-CV-02862 (JST), 2015 WL 12976923, at *2 (N.D. Cal. June 11, 2015).

Martucci satisfactorily explains that maritime practices are not heavily regulated and that a reasonable seaman would consider SOLAS and the ISM even if not required to do so. (Martucci Dep. 83:2–18). Martucci has worked on unregistered vessels not required by law to abide by SOLAS or the ISM. (*Id*. at 22, 26, 92:9–12). He does not assert that SHP violated a specific regulatory requirement or other enhanced duty; he asserts only safety protocols he is aware of from common ship practices. (*Id*. at 83:24–84:7, 86:3–10). He further clarifies that it would be up to the person in charge to determine how best to complete an operation taking common practices into account. (*Id*. at 85:22–86:10). During his deposition, Martucci exhibited some uncertainty about whether the ISM applied. (*Id*. at 131). Ultimately, he merely asserts that the ISM informs what a reasonable seaman might do to ensure safety. (*Id*. at 94:16–20).

A reasonable juror could understand that while SHP was not *required* to adhere to the standards set forth by SOLAS and the ISM, a reasonable seaman might consider them in determining whether the conditions were reasonably safe to proceed with the transfer and whether the stores were too heavy. His report was "issued on the basis of the ordinary practices of the maritime industry," (Martucci Dep. 89:17–19), and his testimony would help the trier of fact to understand that there are other possible methods of vessel-to-vessel transfer that might be considered in determining how to proceed with such an operation. Through cross-examination, the jury could also determine whether the alternatives suggested would have been safer, and if SHP was negligent by foregoing them.[17]

_____

[17] SHP cites *Soliman* for the proposition that "[t]he suggestion that more frequent drills, written procedure or different training would have been effective is undercut by the frequency and routineness of the task." (Def.'s Reply at 9). That citation is not accurately contextualized. *See* 235 F. Supp. 3d at 410 ("I am inclined to agree that it would impose too high a burden on the ship's officers if they were required to conduct a risk assessment before every routine task. However, the fact that no risk assessment was ever conducted is troubling."). There is no specific evidence that Matzkow was trained on vessel-to-vessel transfer of stores, even though he performed the task regularly. There is no

### 3.   Captain Martucci's Testimony is Relevant

The Court must also determine "whether the expert's reasoning or methodology 'fits' the facts of the case and whether it will aid the trier of fact's understanding of the evidence." *Douglas,* 431 F. Supp. 3d at 834 (citing *Daubert*, 509 U.S. at 591). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Chem Carriers Towing*, 431 F. Supp. 3d at 835 (quoting *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996)). Similarly, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Hollman*, 928 F. Supp. 2d at 670 (quoting *First Union Nat'l Bank v. Benham*, 423 F.3d 855, 862 (8th Cir. 2005)).

At the time Martucci wrote his expert report, he did not know the registry of the vessels involved, meaning he could not be sure whether ships were subject to SOLAS or the ISM. (Martucci Dep. 9:17 –18, 25:4–7, 27:21–25, 133). In light of the missing information, Martucci relied on Matzkow's Complaint; undated photographs of sea conditions, the vessels, and Matzkow's right arm; Defendant's disclosures; and the depositions of Matzkow, D. Masse, G.

---

specific evidence that there were any operational or planning discussions about transferring stores. However, distinct from the instant matter, in *Soliman*, the ship company was bound by the ISM and breached its duty by failing to provide training on safe pulling, in addition to the training provided on safe lifting. *Id.* at 419.

Masse, Raucci, and Gove. (*Id.* 29:10–12, 29:23–30:4, 31: 7–9, 44, 83, 133; Martucci Report at 4). He did not rely on Feminella's deposition.[18]

Martucci's testimony is not so fundamentally unsupported that it offers no possible assistance to the jury. The trier of fact can hear the conflicting testimony about whether alternatives would have been safer or riskier and determine whether or not SHP was negligent in its failure to implement any of them and whether the lack of equipment caused the vessels to become unseaworthy. Although SHP argues that Martucci's opinion is not complete, (Def.'s Reply at 8), SHP has not had a problem introducing evidence from their expert and SHP employees that these alternatives would not have created safer conditions. The jury can weigh Martucci's testimony against Feminella's testimony that the alternatives proposed would have been even more dangerous. (Feminella Dep. at 115).

*      *      *

There is nothing wrong with Martucci's process of arriving at his opinions through his experience and understanding of non-binding authorities; however, it must be made clear to the factfinder whether the SOLAS and ISM are binding on either the New Jersey or Yankee. This can be accomplished at trial. Accordingly, Matzkow has demonstrated by a preponderance of the evidence that Martucci's opinions are admissible under *Daubert* and the Federal Rules of Evidence.[19]

---

[18] Although Martucci could not identify a captain signature in the logbook, (Martucci Report at 5), Feminella later identified his own initials and handwriting associated with the relevant entry, (Feminella Dep. 80:22–24).

[19] While I am not making a determination on admissibility of the report at this time, I did not rely on the report in deciding this motion for summary judgment.

## II.   SHP Is Not Entitled to Summary Judgment

### A.  Summary Judgment Standards

Federal Rule of Civil Procedure 56 mandates that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to material fact exists if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In ascertaining whether such a dispute exists, a court must review the evidence in the light most favorable to the non-movant, *see Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and must "resolve all ambiguities and draw all inferences in favor of [that party]." *Byrnie v. Town of Cromwell Bd. Of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000). The court may consider only evidence that would be admissible at trial. *Abreu v. City of N. Y.*, No. 04-CV-1721 (JBW) (VVP), 2006 WL 401651, at *3 (E.D.N.Y. Feb. 22, 2006) (citations omitted). "In reviewing the evidence and the inferences that may reasonably be drawn, the court 'may not make credibility determinations or weigh the evidence.'" *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545–46 (2d Cir. 2010)). "[T]he fundamental maxim remains that on a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried." *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975) (internal quotation marks omitted).

The moving party bears the burden of establishing that no material fact is in dispute. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Where the non-movant will ultimately

bear the burden of proof at trial, however, she must present evidence to support the essential elements of her claims in order to survive a motion for summary judgment. *See Celotex Corp.*, 477 U.S. at 323. Absent evidence supporting the non-movant's claims, judgment should be entered for the moving party. *See id.* ("a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial"); *see also Crawford v. Franklin Credit Management Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) ("[W]here the nonmoving party will bear the burden of proof on an issue at trial, the moving party may satisfy its burden by pointing to an absence of evidence to support an essential element of the nonmoving party's case.") (internal quotations, citations, and brackets omitted). To satisfy her burden, the non-movant may rely upon depositions and other documentary evidence. FED. R. CIV. P. 56(c)(1)(A*); see Celotex Corp.*, 477 U.S. at 324. The non-movant cannot create a genuine dispute of material fact by "rely[ing] on the allegations in his or her pleadings, conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Cushing v. Morning Pride, Mfg., L.L.C.*, No. 05-CV-3612 (DRH) (WDW), 2008 WL 283772, at *10 (E.D.N.Y. Jan. 30, 2008) (citation and internal quotation marks omitted); *see also Patterson v. Cnty. of Oneida*, N.Y., 375 F.3d 206, 219 (2d Cir. 2004); *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

### B. Jones Act

The Jones Act ("the Act") provides a cause of action in negligence for any seaman injured in the course of his employment. 46 U.S.C. § 30104. The Jones Act "places a . . . duty on the [ship-]owner to provide a reasonably safe workplace." *Stein v. Cty. of Nassau*, 417 F. Supp. 3d 191, 201 (E.D.N.Y. 2019) (quoting *Oxley v. City of New York*, 923 F.2d 22, 25 (2d Cir. 1991)). "To establish a claim for negligence, plaintiffs must establish a legal duty, a breach of that duty, causation, and

damages." *Nasser v. Port Imperial Ferry Corp.*, No. 19-CV-0845 (EK) (ST), 2021 WL 878732, at *2 (E.D.N.Y. Mar. 9, 2021) (citing *In re Treanor*, 144 F. Supp. 3d 381, 385 (E.D.N.Y. 2015)).

"While a claim of negligence does not preclude the granting of summary judgment, courts are generally reluctant to grant summary judgment in negligence cases because the assessment of reasonableness is generally a question of fact in all but the most extreme cases." *Id*., at *4 (quoting *Palmieri v. Celebrity Cruise Lines, Inc.*, No. 98-CV-2037 (LAP)( HBP), 1999 WL 494119, at *3 (S.D.N.Y. July 13, 1999)).

The parties do not dispute that SHP owned, operated, and controlled the New Jersey, (Ans. ¶¶ 11–13), and that that on the day in question Matzkow was acting in the scope of his employment with SHP as a seaman on the New Jersey. (Compl. ¶ 18; Ans. ¶ 18). Therefore, SHP had a legal duty to Matzkow under the Jones Act.

Matzkow thus bears the burden of establishing a causal relationship between a negligent violation of SHP's duty and his injury. *Saleh v. United States*, 849 F. Supp. 886, 891 (S.D.N.Y. 1994) (quoting Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 377 (2d ed., 1975)); *see also Williams v. United States*, 712 F. Supp. 1132, 1135 (S.D.N.Y. 1989). In keeping with the remedial purposes of the Act, the standard that a plaintiff must meet to establish negligence is relatively low: "A plaintiff is entitled to go to the jury if the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury . . . for which damages are sought." *Quiles v. City of New York*, 978 F. Supp. 2d 374, 384–85 (S.D.N.Y. 2013); *Diebold*, 805 F.2d at 57 (quoting *Rogers v. Mo. Pac. R. Co.*, 352 U.S. 500, 506, 77 S. Ct. 443, 1 L. Ed. 2d 493 (1957)).

i.   *Breach Element Raises Disputed Material Facts*

A ship-owner must "exercise reasonable care to protect its employees from known hazards or potential hazards of which it should have known[.]" *Marasa v. Atlantic Sounding Co., Inc.*, 557 Fed. Appx. 14, 17 (2d Cir. 2014). Under this reduced standard, "an employer may be held liable . . . for risks that would be too remote to support liability under common law [negligence.]" *Williams*, 196 F.3d at 407; *see also Soliman*, 235 F. Supp. 3d at 417.

The seaman "must prove, . . . by a preponderance of the evidence: '(1) that a dangerous condition actually existed on the ship; (2) that the defendant shipowner had notice of the dangerous condition and should have reasonably anticipated the plaintiff might be injured by it; and (3) that if the shipowner was negligent, such negligence proximately caused the plaintiff's injuries." *Juliussen v. Buchanan Marine, L.P.*, No. 08-CV-1463 (DCP)**,** 2010 WL 86936, at *8 (S.D.N.Y. Jan. 7, 2010) (quoting *Diebold v. Moore McCormack Bulk Transp. Lines, Inc.*, 805 F.2d 55, 58 (2d Cir.1986)). "A dangerous condition is one that is unsafe or hazardous, creating the potential for injury-causing accidents to occur." *Id.* (citing *O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 66 (2d Cir.2002) ("finding that manually lifting steel forms alone, a task ordinarily performed by a crane, constitutes an 'unreasonably dangerous activity'"). "[A] seaman may recover for injuries caused by his employer's requirement that he do his job in a dangerous manner when other safer methods are readily available, . . . or that he use equipment that is not reasonably fit for the safe performance of the task at hand." *Diebold*, 805 F.2d at 58; *Stein*, 417 F. Supp. 3d at 201–02. The vessel owner has a duty to use "due and proper care" to provide a competent crew—including the captain on board—and to "provide . . . instruction or training to its crew as to how to best perform the [maritime] task [at hand]." *In re Moran Towing Corp.*, 984 F. Supp. 2d 150, 178 (S.D.N.Y. 2013) (citing *Harrington v. Atlantic Sounding Co., Inc.***,** 916 F. Supp. 2d 313, 323 (E.D.N.Y. 2013),

aff'd in part sub nom, *Marasa*, 557 Fed. Appx. 14 ; *see also Messina v. Murray*, 574 F.3d 119, 127 (2d Cir. 2009) (quoting *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1155 (2d Cir.1978)); *Haney v. Miller's Launch, Inc.*, 773 F. Supp. 2d 280 (E.D.N.Y. 2010). "[T]he absence of [a regulatory] violation" is "hardly dispositive" of Plaintiff's claim. *Nasser*, 2021 WL 878732, at *3 (quoting *Janover v. Ryder Sys., Inc.*, No. 05-CV-2841 (ENV)(MDG), 2006 WL 2335546, at *2 (E.D.N.Y. Aug. 10, 2006)); *see also Palmieri*, 1999 WL 494119, at *5; *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959).

Matzkow argues that SHP was negligent in proceeding with the vessel-to-vessel transfer of stores in the conditions that morning and for failing to provide equipment for transferring stores in rough open water. (Pl.'s Opp'n at 17). SHP argues that (1) "the transfer of stores was a routine operation . . . [and] involve[d] the whole crew, which was trained on the safe transfer of stores through in-person training;" and (2) there is not reliable or admissible evidence about best practices for ship-to-ship transfer or the weather conditions being "so extraordinary." (Def.'s Reply at 2).

There is a material fact issue as to whether failure to conduct drills for vessel-to-vessel transfer of stores, break down the stores, or transfer them by other means or in other conditions constituted a breach of SHP's duty to provide a reasonably safe workplace. As uninspected vessels, the New York and Yankee were subject to OSHA and Coast Guard regulations, *Spentonbush–Red Star Co.*, 155 F.3d at 594, but Matzkow need not allege a specific regulatory violation. *See, e.g.*, *id.* at 595 ("In the absence of a *per se* rule, OSHA is simply evidence of the standard of care, the violation of which may be accepted or rejected as proof of negligence by the trier of fact according to the sum total of all the evidence."); *Nasser*, 2021 WL 878732, at *2–4.

The parties disagree over whether SHP was negligent in failing to develop a procedure for stores handling. (Pl. Opp'n at 17–18; Def.'s Reply at 9; ECF No. 53-1 ¶ 27). Their experts also dispute this issue, and disagree as to whether the operation should have been recorded in the logbook. (Martucci Report at 5; ECF No. 51-7 at 4). The parties further disagree on the conditions at sea and whether the stopping and starting of the transfer occurred or was out of the ordinary. (ECF No. 53-1 at 14).

Matzkow asserts that "safe practice requires crew members to always have a hand available to grab a railing or man ropes." (ECF No. 53-1, ¶ 26). SHP disagrees and states that this is a misrepresentation of the Feminella deposition in which he stated that, while there is not a written protocol, on-the-job training teaches deck hands to always hold a rail for safety. (*Id*. ¶ 26; Feminella Dep. 36:6-37:8). It is uncontested that SHP does not require its crew to perform drills for the safe transfer or stores and that the entire crew is engaged in the actual transfer of stores. (ECF No. 53-1, ¶ 27). Feminella was trained to break down stores for safety. (*Id*. at ¶ 29). However, SHP disagrees that supervision and direction was required for vessel-to-vessel transfer of stores and that stores were not broken down on the day in question. (*Id*. at ¶ 30). It further denies that injury during transfer on rough water was foreseeable. (*Id*. at ¶ 33).

Thus, a reasonable juror could conclude that SHP's failure to make adjustments for vessel-to-vessel transfer of the stores fell below a reasonable standard of care. *Deykina v. Chattin*, No. 12-CV-2678 (ARR) (CLP), 2014 WL 46288692, at *7 (E.D.N.Y. Sept. 16, 2014) (denying summary judgment where the "parties' expert reports provide differing assessments of whether the . . . [design] of the stairs violate accepted engineering practices and constitute defective conditions"); *Juliussen*, 2010 WL 86936, at *10 ("Defendant's evidence is not so one-sided that no question of fact remains.").

###### ii.   Causation Element Raises Disputed Material Facts

The Jones Act requires only that the negligence of the employer "played any part, even the slightest, in producing the injury," *Oxley*, 923 F.2d at 25, but a plaintiff must still offer "reasonably persuasive proof." *Reynolds v. Sealift, Inc.*, No. 07-CV-5519, 2009 WL 424387 at *2 (2d Cir. Feb.20, 2009) (summary order); *Lisowski*, 2009 WL 763602, at *12; *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) (in Jones Act case expert testimony is required where "the nexus between the injury and the alleged cause would not be obvious to the lay juror.") Evidence of causation may be entirely circumstantial and direct proof is not required. *See Rogers*, 352 U.S. at 507.

In a case under the Jones Act, a plaintiff need not introduce medical testimony that defendant's negligence was "definitely" the cause of plaintiff's injury, and medical testimony as to causation need not be unanimous. *See Sentilles v. Inter-Caribbean Shipping Corp.*, 361 U.S. 107, 108-109 (1959). Non-medical expert testimony is unnecessary in cases where jurors "are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training." *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962) (internal quotation marks omitted). The Second Circuit has noted that "the jury 'is not permitted to speculate on proximate cause in the absence of reasonably persuasive proof that the negligence was the probable cause of the injury.'" *Reynolds*, 2009 WL 424387, at *2 (quoting *Fitzgerald v. A.L. Burbank & Co.*, 451 2d 670, 681 (2d Cir.1971)); *Lisowski*, 2009 WL 763602, at *11.

SHP highlights that no causal connection has been established between the bounces of the vessels and the injury. (ECF No. 53-1 ¶ 34). However, no expert testimony is required for a lay

juror to understand that boats moving up and down or back and forth could cause someone to lose their balance. Further, Doctor Gilbert identified the incident as the most likely cause of the injury. (ECF No. 51-3 ¶ 41)

Matzkow argues that he would not have been injured in calmer water. (Pl.'s Opp'n at 17; Def.'s Reply at 2). A reasonable jury may plausibly find this to be true. *Soliman*, 235 F. Supp. 3d at 420 ("[I]t is reasonable to infer that had Soliman not pulled a bag, placing his arm in a vulnerable position in the process, he would not have suffered a torn rotator cuff. This is sufficient to satisfy the reduced causation standard under the Jones Act."); *Juliussen,* 2010 WL 86936, at *10 ("a reasonable jury may plausibly find that the stairwell's condition and lack of adequate lighting played some part in causing Juliussen's accident and injuries, even if only *the slightest*.") (emphasis original).

*   *   *

Accordingly, SHP's motion seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on Matzkow's Jones Act claim is denied. *See Golden v. OSG Ship Mgmt., Inc.*, No. 14-CV-06636 (CRK**),** 2018 WL 9945199, at *4 (S.D.N.Y. Mar. 12, 2018) (jury's duty to weigh conflicting testimony); *Quiles*, 978 F. Supp. 2d at 381 (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) ("Assessments of credibility, choosing between 'conflicting versions of the events,' and 'the weighing of evidence are matters for the jury, not for the [C]ourt.'").

### C.   Unseaworthiness

The doctrine of seaworthiness, under general maritime law, "establishes that every shipowner owes an absolute and non-delegable duty to seamen properly aboard its vessel to provide a seaworthy ship." *Soliman*, 235 F. Supp. 3d at 418, (quoting *Martinez v. City of N.Y.*, No. 14-CV-

29

632, 2016 U.S. Dist. LEXIS 42569, at *4 (S.D.N.Y. Mar. 30, 2016)). "Under the principles of seaworthiness, an owner has an absolute duty to furnish a ship, crew, and appurtenances reasonably fit for their intended service." *Oxley*, 923 F.2d at 24. "The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." *Mitchell v. Trawler Racer, Inc*., 362 U.S. 539, 550 (1960).

"The concept of the unseaworthiness of a ship is a relative one, dependent for definition in each instance upon the circumstances in which her fitness is drawn into question." *Mosley v. Cia. Mar. Adra, S.A*., 314 F.2d 223, 227 (2d Cir. 1963). "A finding of seaworthiness is usually a finding of fact." *Mahnich v. Southern S.S. Co.*, 321 U.S. 96, 98 (1944); *see also Stein*, 417 F. Supp. 3d at 198; *Buckley v. Cty. of Suffolk*, No. 10-CV-1110 (JFB) (AKT), 2013 WL 122972, at *3 (E.D.N.Y. Jan. 9, 2013).

"[L]iability based upon unseaworthiness is wholly distinct from liability based upon negligence" because "unseaworthiness is a condition, and how that condition came into being -- whether by negligence or otherwise -- is quite irrelevant to the owner's liability for personal injuries resulting from it." *Usner v Luckenbach Overseas Corp*., 400 US 494, 499 (1971). Since liability for unseaworthiness is not dependent on the owner's negligence or notice of the offending condition, unseaworthiness is characterized as "liability without fault." *Oxley*, 923 F.2d at 25; *Soliman*, 235 F. Supp. 3d at 418. Still, liability for an unseaworthiness claim is not "absolute" and some defect must be present. *Barlas v. United States*, 279 F. Supp. 2d 201, 207 (S.D.N.Y. 2003).

A plaintiff must also prove causation for an unseaworthiness claim. *Id*. While the Second Circuit has "not articulated a clear causation standard," I join the judges in this District who find that "a heightened causation standard applies, which requires the unseaworthiness to be substantial cause of the injury." *Soliman*, 235 F. Supp. 3d at 419; *see also Lisowski,* 2009 WL 763602, at *14.

The parties do not dispute that SHP owned, operated, and controlled the New Jersey and Yankee, (Ans. ¶¶ 11–14), and that that on the day in question Matzkow was acting in the scope of his employment with SHP as a seaman on the New Jersey, (Compl. ¶ 18; Ans. ¶ 18). Matzkow thus bears the burden of showing that some defect caused Defendant's vessel to be unseaworthy, and that that unseaworthiness was a substantial cause of his injury.

### i.   Presence of a Defective Condition Raises Disputed Material Facts

The condition of unseaworthiness "might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper. For any of these reasons, or others, a vessel might not be reasonably fit for her intended service." *Usner*, 400 US at 499, (footnotes omitted). A ship will be considered unseaworthy when it is "insufficiently or defectively equipped[,]". *Waldron v. Moore-McCormack Lines, Inc.,* 386 U.S. 724, 726 (1967), or when it is being operated by an incompetent crew. *Soliman*, 235 F. Supp. 3d at 418; *In re Complaint of Messina*, 574 F.3d 119, 127 (2d Cir. 2009). "A crew is incompetent, and thus the ship unseaworthy, when the ship's owner fails to provide adequate training for the task to be performed." *Soliman*, 235 F. Supp. 3d at 418. Lack of training for a "specific task" can lead to a finding of unseaworthiness. *See Marasa,* 557 F App'x at 18. Further, the warranty of seaworthiness extends both to ships' stores and to their defective

packaging. *Barlas*, 279 F. Supp. 2d at 209. A condition of unseaworthiness may be found even when equipment is in working order if that equipment is altered or misused in a way that renders it unseaworthy, and "unsafe work practices involving seemingly safe pieces of equipment on a vessel will render the vessel unseaworthy." *Buckley*, 2013 WL 122972, at *3.

Matzkow argues that the lack of safety training and equipment for vessel-to-vessel transfers rendered the vessels unseaworthy. (Pl.'s Opp'n. at 18–19). There is a dispute of material fact over whether Matzkow was trained and about whether this training, or lack thereof, rendered the vessel unseaworthy. SHP contends that "Matzkow and other members of the crew were trained in vessel to vessel transfer of stores while underway" while Plaintiff "denies that he was provided with proper training and equipment with regard to the safe transfer of stores." (ECF No. 53-1 ¶ 3). Matzkow contends that as a cook, he had no proper training in vessel-to-vessel transfers. (*Id.*).

Disputes over protocols and training also extend to whether stores should have been broken down, (ECF No. 53-1 ¶ 29); whether Matzkow should have been trained to hold on to something and lift with one hand for safety, (*id.*, at ¶ 26); and whether oversight was required for vessel-to-vessel transfers (*id.*, at ¶ 30). The parties also dispute whether there was a three-foot gunwale that stores had to be lifted over during the transfer. (*Id.*, at ¶ 5; Def.'s. Mem. at 15).

The parties agree that no safety equipment was provided for vessel-to-vessel store transfers, (ECF No. 53-1 ¶ 28), but dispute whether safety equipment was required for the safe completion of a stores transfer. Matzkow argues that the vessels were unseaworthy in that SHP failed to provide equipment for transfer of stores in rough open water, (Pl.'s Opp'n at 19), and that certain equipment could have made the transfer safer. (Pl.'s Opp'n at 10). SHP argues that no such

equipment was required for a safe transfer and that safety equipment suggested by Martucci might have actually made the transfers more dangerous. (Def.'s Mem. at 22).

These disputes raise questions of material fact that must be decided by a fact finder. A reasonable juror could conclude that SHP's vessel was unseaworthy by reason of improper training and oversight, *see Marasa*, 557 F. App'x at 18 (affirming a finding of unseaworthiness when "crew was not trained for the specific task . . . at issue."); unsafe work practices related to the transfer of stores, *Gutierrez v. Waterman S.S. Corp*., 373 U.S. 206, 213 (1963) ("Seaworthiness is not limited, of course, to fitness for travel on the high seas; it includes fitness for loading and unloading."); *Barlas*, 279 F. Supp. 2d at 209; *Buckley*, 2013 U.S. Dist. LEXIS 3509, at *8; or the insufficiency or lack of equipment. *Waldron*, 386 U.S. at 726. Accordingly, summary judgment is inappropriate on these matters.

ii.   Whether the Alleged Unseaworthiness was a
      <u>Substantial Cause of the Injury is Disputed</u>

Unseaworthiness claims have a stricter causation standard than negligence claims. *Soliman*, 235 F. Supp. 3d at 419. Matzkow therefore bears the burden of showing that some unseaworthy condition of the vessels at issue was a "substantial cause of the injury." *Id*.

There is a material fact dispute as to what caused Matzkow's injury. (ECF No. 53-1 ¶ 34). Matzkow argues that his injury was caused by conditions on the ships that caused them to knock into one another and move apart, causing the heavy box he was moving to hit him, and causing his bicep tendon injury. (ECF No. 53-1 ¶ 34; Compl. ¶19; Pl.'s Opp'n at 8). SHP disputes Matzkow's version of events and argues that no causal connection been established between the bounces of the vessels and Matzkow's injury. (ECF No. 53-1 ¶ 34; Ans. ¶19).

Matzkow has offered evidence that he was examined by SHP's physician, Dr. Gilbert, who determined that "[b]ased upon the records reviewed and the history submitted, the most likely cause of the distal biceps tendon rupture was the alleged injury at work on 9/30/2015." (ECF No. 53-1 at ¶ 41; Gilbert Report at 4). Matzkow has also offered evidence that the ships bounced off one another in an unexpected way that was not typical. (Gove Dep. 41–42).

Rule 56 requires that at the summary judgment stage, all evidence must be reviewed in the light most favorable to Matzkow, and all ambiguities must be resolved and inferences drawn in his favor. *Overton*, 373 F.3d at 89; *Byrnie*, 243 F.3d at 101. Matzkow has offered evidence of several conditions that a reasonable juror could find to have created a condition of unseaworthiness, and a reasonable juror could conclude that an unseaworthy condition was a substantial cause of Matzkow's injury. *See Harrington*, 916 F. Supp. 2d at 325 (in which an unseaworthiness claim succeeded based on findings that a mate "allowed the boat to move out of position (relative to the buoy), thereby causing plaintiff's injury, which likewise reflects the inadequate—in fact, nonexistent—training that defendants provided.").

\*      \*      \*

Accordingly, SHP's motion seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on Matzkow's unseaworthiness claim is denied. *Mosley*, 314 F.2d at 227; *Quiles*, 978 F. Supp. 2d at 386 ("Whether a vessel is unseaworthy, and whether an unseaworthy condition proximately caused a plaintiff's injury, generally are questions of fact for the jury.").

### D.  Pain and Suffering

Damages for pain and suffering may be recovered under the Jones Act. *Avecillas v. Ronback Marine Contr. Corp.*, No. 14-CV-4552 (SJF) (SIL), 2015 WL 4162769, at \*4 (E.D.N.Y. July 8,

34

2015) ("Damages for past and future pain and suffering are recoverable under the Jones Act.");
*see also Harrington,* 916 F. Supp. 2d at 328-29; *Marasa*, 557 F. App'x at 20. It is unclear from
Defendants' briefing whether they seek to challenge Plaintiff's entitlement to damages at all, or a
specific damage amount. Regardless, the issue of damages remains a question of fact for the jury.

## CONCLUSION

For the reasons set forth above, SHP's motion for summary judgment is DENIED.

**SO ORDERED.**

*Ramon E. Reyes, Jr.*
Hon. Ramon E. Reyes, Jr.
United States Magistrate Judge
Dated: January 7, 2022